# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-3443
_____

United States of America

*Plaintiff - Appellant*

v.

Anthony E. Myers, also known as Anthony E. Meyers

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: June 17, 2022
Filed: December 29, 2022

_____

Before LOKEN and KELLY, Circuit Judges, and MENENDEZ, District Judge.[1]

_____

KELLY, Circuit Judge.

---

[1]The Honorable Katherine M. Menendez, United States District Judge for the District of Minnesota, sitting by designation.

The government appeals the district court's[2] ruling that Anthony Myers does not qualify for a sentencing enhancement under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), because his prior cocaine conviction under Missouri law is not a "serious drug offense."  We affirm.

**I.**

A defendant convicted of unlawful possession of a firearm under 18 U.S.C. § 922(g) who has three prior convictions for violent felonies and/or serious drug offenses faces a mandatory minimum sentence of 15 years.  See 18 U.S.C. § 924(e). In July 2020, Myers was convicted by a jury of one count of being a felon in possession of a firearm, in violation of §§ 922(g)(1) and 924(a)(2).[3]  According to the presentence report, Myers was subject to the ACCA's mandatory minimum sentence because he had two prior convictions for violent felonies and one prior conviction for a serious drug offense.  Myers objected, arguing that his 2003 conviction for the sale of cocaine under Missouri Revised Statute § 195.211 (2000)[4] does not qualify as a serious drug offense under the ACCA because that Missouri statute criminalized conduct that does not violate federal law.

The district court sustained Myers's objection.  The court agreed that Myers's conviction under § 195.211 was not a "serious drug offense" under the ACCA

---

[2]The Honorable Beth Phillips, Chief Judge, United States District Court for the Western District of Missouri.

[3]18 U.S.C. § 924 was later amended; currently, § 924(a)(8) applies to convictions under § 922(g).

Myers was also convicted of possession of a controlled substance in violation of 21 U.S.C. § 844(a) and sentenced to 12 months' imprisonment on that count, to run concurrently with the sentence imposed for illegal possession of a firearm. The government does not appeal this aspect of his sentence.

[4]Missouri repealed § 195.211 and recodified it in chapter 579, effective as of 2017.

because at the time of his conviction in 2003, "Missouri law defined 'cocaine' as encompassing its 'isomers' without limiting the definition of 'isomers' to optical and geometric isomers as the federal statute did," meaning that Missouri's definition of cocaine was categorically broader than the federal definition. The court sentenced Myers to 120 months of imprisonment, the then-applicable statutory maximum under 18 U.S.C. § 924(a)(2) without the ACCA enhancement. The government appeals.

## II.

We review de novo whether a prior conviction qualifies as a serious drug offense under the ACCA. United States v. Oliver, 987 F.3d 794, 805 (8th Cir. 2021). A serious drug offense is defined in relevant part as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii). As relevant here, a prior state drug conviction is a predicate offense for purposes of the ACCA only if the state offense involved a "controlled substance" as that term is defined under federal law.[5] Courts determine whether a prior conviction qualifies as a serious drug offense by looking to the scope of the state law, not to the specific facts underlying the prior conviction. Oliver, 987 F.3d at 806. This "categorical approach" focuses solely on whether the elements of the crime of conviction match the corresponding federal drug offense. Id.

Under the categorical approach, the ultimate burden is on the government to prove that the prior conviction is a qualifying offense under the ACCA. United States v. Clark, 1 F.4th 632, 635 (8th Cir. 2021). Where "the state offense sweeps more broadly, or punishes more conduct than the federal definition, the conviction

---

[5]For ACCA purposes, the relevant federal definition is that "in effect at the time of the federal offense." United States v. Perez, 46 F.4th 691, 699 (8th Cir. 2022).

does not qualify as a predicate offense." United States v. Vanoy, 957 F.3d 865, 867 (8th Cir. 2020). To determine whether a state statute "sweeps more broadly," we examine its text and structure. United States v. Owen, 51 F.4th 292, 294 (8th Cir. 2022) (per curiam). In doing so, we apply Missouri principles of statutory construction, which requires giving words their "plain and ordinary meaning." State v. Johnson, 524 S.W.3d 505, 510 (Mo. banc 2017); Behlmann v. Century Sur. Co., 794 F.3d 960, 963 (8th Cir. 2015) ("Interpreting state statutes, this court applies that state's rules of statutory construction."); see In re Trenton Farms RE, LLC v. Mo. Dep't of Nat. Res., 504 S.W.3d 157, 164 (Mo. Ct. App. 2016) (explaining that administrative rules and regulations are to be interpreted using same principles of construction as statutes). "Only where the language is ambiguous" should the court "resort to other rules of statutory construction." Treasurer of Mo.-Custodian of Second Inj. Fund v. Witte, 414 S.W.3d 455, 460 (Mo. banc 2013).

Myers's prior Missouri conviction[6] involved cocaine, so we compare the definition of cocaine under Missouri law at the time of Myers's Missouri conviction with the definition of cocaine under federal law at the time of Myers's instant federal offense.[7] In 2003, Missouri's definition of cocaine covered "coca leaves and any salt, compound, derivative or preparation of coca leaves including cocaine and ecgonine and their salts, *isomers*, derivatives and salts of isomers and derivatives and any salt, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances." 19 C.S.R. 30-1.002(1)(B)1 (2000) (cleaned up and emphasis added). The Missouri schedule did not define isomer. Turning to the dictionary definition of isomer, the term encompasses "any one of a number of isomeric compounds." Isomer, Oxford English Dictionary, https://www.oed.com/view/Entry/100097?redirectedFrom=isomer#eid (last visited

---

[6]Section 195.211 was divisible by controlled substance. See United States v. Young, 6 F.4th 804, 810 (8th Cir. 2021).

[7]See Perez, 46 F.4th at 700 ("[T]he categorical approach requires comparison of the state drug schedule at the time of the prior state offense to the federal schedule at the time of the federal offense.").

Dec. 1, 2022); see also Owen, 51 F.4th at 295 ("By specifically mentioning 'the isomers of cocaine,' the definition [of cocaine] sweeps in any substance with the same chemical composition as cocaine, even if it has a different structural form." (cleaned up) (quoting Dictionary of Science and Technology 1151 (1992)). Missouri's definition, then, swept in all isomers, including *positional*, optical, and geometric isomers.

The federal definition, however, criminalizes only optical and geometric isomers—but not positional isomers. 21 U.S.C. §§ 802(14), 812, sched. II(a)(4); 21 C.F.R. § 1308.02. Because Missouri's definition of cocaine included positional isomers while the federal definition does not, the Missouri definition is unambiguously broader than its federal counterpart. Moreover, Missouri courts have interpreted the Missouri drug schedule as making all isomers of cocaine illegal. See State v. Greene, 785 S.W.2d 574, 577–78 (Mo. Ct. App. 1990) (concluding that the Missouri drug schedule "renders [defendant]'s attempts to distinguish between isomers useless, as all isomers of cocaine are prescribed"); State v. James, 796 S.W.2d 398, 399 (Mo. Ct. App. 1990) (holding that the state's witness needed to testify only that the substance at issue was cocaine for it to fall within the language of the statute).[8]

The government contends that interpreting "isomers" in the cocaine schedule to include all isomers would render superfluous other provisions of the Missouri drug schedule that explicitly included "optical, position, and geometric" isomers as the proscribed isomers of a substance. See, e.g., 19 C.S.R. 30-1.002(1)(A)3 (2000).

---

[8]The government attempts to distinguish Greene and James by pointing out that those cases involved a debate over two optical isomers. True, but nothing in those decisions suggests that the analysis would be different for another type of isomer, here positional isomers. The Missouri courts interpreted the text of the Missouri drug schedule as covering *all* isomers of cocaine, without regard to the type of isomer. James, 796 S.W.2d at 399 (rejecting requirement that the state prove the composition of cocaine samples to obtain a conviction); Greene, 785 S.W.2d at 578 ("[A]ll isomers of cocaine are prescribed.").

However, the substances whose isomers expressly included "optical, position, and geometric isomers" were found in Schedule I, which specified which forms of a given substance were prohibited drug-type by drug-type. But cocaine was a Schedule II drug. Unlike Schedule I, Schedule II included all forms of the listed substances. Compare, e.g., 19 C.S.R. 30-1.002(1)(A) (specifying that stimulants include only "optical isomers" while opiates include "their isomers" "whenever the existence of such isomers . . . is possible"), with 19 C.S.R. 30-1.002(1)(B)1 (proscribing all forms of the listed substances whether of "vegetable origin or chemical synthesis" unless "specifically excepted" or "listed in another schedule"). Because Schedule II proscribed all forms, it was unnecessary for the state to expressly indicate that cocaine includes any one specific type of isomer. Indeed, no substances listed in Schedule II included the "optical, position, and geometric" description of isomer.

The government also raises arguments about the non-existence of positional isomers in the drug trade, such that Missouri would have no reason to criminalize them, and about Missouri's summary rulemaking process, which was designed to conform the Missouri schedules to the federal schedules. But absent ambiguity, we are "bound to give effect to the intent reflected in the statute's plain language and cannot resort to other means of interpretation." Karney v. Dep't of Lab. & Indus. Rels., 599 S.W.3d 157, 162 (Mo. banc 2020); see also Owen, 51 F.4th at 296. Because the text of the Missouri drug schedule plainly criminalized all isomers of cocaine, our inquiry ends there. Cf. Owen, 51 F.4th at 296 (concluding that Minnesota schedule proscribing "isomers of cocaine" was unambiguously broader than federal definition).[9] Given the unambiguous breadth of Missouri's definition of cocaine, we agree with the district court that Myers's prior Missouri conviction for the sale of cocaine was not a predicate offense for purposes of the ACCA.

_____

[9]Notably, Owen addressed Minnesota law, which at the time of Owen's convictions, as here, required the Minnesota drug schedule to similarly control substances like its federal counterpart. See Minn. Stat. § 152.02, subd. 12 (1973) (amended 2017).

## III.

For the foregoing reasons, we affirm the judgment of the district court.[10]

LOKEN, Circuit Judge, dissenting.

Like many States, Missouri adopted a version of the Uniform Narcotic Drug Act in Chapter 195 of its Revised Statutes. See 12 Vernon's Ann. Mo. Stat. § 195.005. Like its federal counterpart, 21 U.S.C. §§ 811(a), 812, the Missouri statute established five schedules of controlled substances; listed specific substances in each of the initial schedules; and authorized an Executive Branch entity, the Department of Health and Senior Services (DHSS), to add or remove substances from any schedule, or transfer substances between schedules, under procedures and substantive standards prescribed in the statute. See Mo. Rev. Stat. §§ 195.015, 195.017. If DHSS receives notice that "any substance is designated, rescheduled, or deleted as a controlled substance under federal law," the Department "shall similarly control the substance" unless, after providing public notice and an opportunity to be heard, it "objects to inclusion, rescheduling or deletion." § 195.015.4.[11] The

---

[10]Because we affirm the sentence imposed on the basis that there is no categorical match between the Missouri cocaine offense and the federal cocaine offense, we need not address Myers's argument regarding the government's burden of proof for establishing the existence of an ACCA predicate offense. Nor do we reach Myers's arguments that the government's use of expert witnesses to prove a predicate offense violated his Fifth and Sixth Amendment rights.

[11]When a controlled substance is "designated, rescheduled, or deleted" under federal law, and DHSS does not object, it "shall similarly control the substance under this chapter" and submit emergency rules to the Secretary of State, "clearly stat[ing] if the rules shall be in effect pursuant" to § 195.015.4. By contrast, if DHSS seeks to go beyond the federal schedules, it must do so through notice and comment rulemaking and consider statutory listing factors. Mo. Rev. Stat. § 195.015.

Supreme Court of Missouri upheld this statute, rejecting a constitutional challenge, in State v. Thompson, 627 S.W.2d 298, 303 (Mo. banc 1982):

> Control by the federal government is the factor which triggers mandatory consideration of a substance by the Division of Health under § 195.015.4, RSMo 1978. Whether federal control should mandate consideration of a substance is a decision for the General Assembly.

The court concludes that in 2003, when Anthony Myers committed the predicate state cocaine offense at issue, "cocaine" as listed in 19 C.S.R. 30-1.002(1)(B)1, the DHSS list of Schedule II substances, was categorically broader than 21 U.S.C. § 812(c), Schedule II(a)(4), based on the court's dictionary-fed conclusion that the plain meaning of "isomer" is unambiguous. Under Missouri law, to which we must look for the answer to this issue, plain meaning normally controls, but the Supreme Court of Missouri "look[s] elsewhere for interpretation . . . when the meaning . . . would lead to an illogical result defeating the purpose of the legislature." Spradlin v. City of Fulton, 982 S.W.2d 255, 258 (Mo. banc 1998) (quotation omitted). In my view, that is manifestly true in this case. Accordingly, I respectfully dissent.

## I.

I begin my analysis with a highly relevant decision by Congress in the Dangerous Drug Diversion Control Act of 1984 that the court ignores -- Congress modified Schedule II(a)(4) by adding an explicit reference to cocaine to the definition of "coca leaves" -- "(including cocaine and ecgonine and their salts, isomers, derivatives, and salts of isomers and derivatives)." And it added a new definition of "isomer" -- "[a]s used in schedule II(a)(4), the term isomer means the 'optical or geometric isomer.'" Pub. L. No. 98-473 §§ 507(a), (c), 98 Stat. 2071 (1984), codified at 21 U.S.C. §§ 812(c), Schedule II(a)(4), and 802(14). The intent of this amendment was not, as the court intimates, to remove positional isomers from Schedule II(a)(4). Rather, the intent was to eliminate a "cocaine isomer defense" that had been frustrating controlled substance prosecutions for possession and

-8-

distribution of "coca leaves." This "purely theoretical" defense was based on the fact that only one of eight commonly recognized isomers of cocaine -- L-cocaine -- is natural, i.e., derived from the coca leaf; the others, including L-cocaine's optical isomer -- D-cocaine -- are manufactured (if they exist at all).[12] By expressly including optical and geometric isomers of cocaine in Schedule II(a)(4) Congress eliminated the cocaine isomer defense. See S. Rep. No. 98-225 at 263 (1984), as reprinted in 4 1984 U.S.C.C.A.N. 3182, 3445. The Report explained, "[t]here are no significant changes in the scope of substances subject to control." Id.[13]

The publication of this change to federal Schedule II(a)(4) in 51 Federal Register 15317-01 (1986) triggered DHSS's duty under Mo. Rev. Stat. § 195.015.4 to "similarly control the substance under [Ch. 195]," or object to its inclusion. Accordingly, on May 1, 1987, the Department of Health, Bureau of Narcotics and Dangerous Drugs, published an Order of Rulemaking in the Missouri Register amending its Schedule II listing of coca leaves, 19 C.S.R. 30-1.002(1)(B)1.D., adopting the same language Congress used in § 507(c) of the Dangerous Drug Diversion Control Act of 1984:

> coca leaves (9040) and any salt, compound, derivative or preparation of coca leaves **(including cocaine (9041) and ecgonine (9180) and their salts isomers, derivatives and salts of isomers and derivatives)**

---

[12]See Best v. State, 556 A.2d 701, 711-19 (Md. Spec. App. 1989), discussing decisions of eight of our sister circuits dealing with this issue, almost uniformly rejecting the cocaine isomer defense. Our court apparently never faced the issue.

[13]The court relies on two Missouri Court of Appeals decisions that dealt with defendants who attempted to use the cocaine isomer defense to overturn their cocaine convictions under state law. See State v. James, 796 S.W.2d 398 (Mo. App. 1990); State v. Greene, 785 S.W.2d 574 (Mo. App. 1990). In rejecting that defense, the Court stated that DHSS's 1987 change to 19 CSR 30-1.010 "renders appellant's attempts to distinguish between isomers useless, as all isomers of cocaine are prescribed." Id. at 577-78, followed in James, 796 S.W.2d at 400. On the issue we are considering, the "all isomers" comment does not apply or is irrelevant dictum.

and any salt, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances . . . .

The "Purpose" section of the Order of Rulemaking explained:

> **This rule is being amended to revise the schedules to conform with the federal schedules**. . . . The Department of Health did not object to the removal and additions to the Controlled Substances Schedules in Missouri; **therefore, these substances will be similarly controlled in Missouri.**

12. Mo. Reg. 623-24 (May 1, 1987) (emphases added).

The court bases its conclusion that the Missouri statute is categorically broader than 21 U.S.C. § 812(c), Schedule II(a)(4), on the fact that the Missouri rule uses the term cocaine "isomers" without defining it, whereas that term is defined in the federal statute as limited to optical and geometric isomers of cocaine. But the essential fact is that DHSS in the Missouri rule adopted the bare term "isomers" as it was stated in the operative provision of federal Schedule II(a)(4) as amended by Congress in § 507(c) of the 1984 Act. So the intent of Congress was clear -- to *add* cocaine to the listing, not *remove* one isomer of cocaine. And Missouri legislative intent was equally clear -- to "similarly control" cocaine in Missouri. It is therefore obvious, at least to me, that the Missouri rule must be interpreted as including (or incorporating by implied reference) the federal definition of cocaine isomers contained in a separate federal provision, § 507(a) of the 1984 Act. The court's contrary interpretation, derived from dictionaries and ad hoc intuition, "lead[s] to an illogical result defeating the purpose of the legislature," contrary to Missouri law. Under Missouri law (as elsewhere), "the true intention of the framers must be followed and where necessary the strict letter of the act must yield to the manifest intent of the Legislature." BCI Corp. v. Charlebois Constr. Co., 673 S.W.2d 774, 780 (Mo. banc 1984). The court's dictionary-based application of the categorical approach violates the obvious intent of two legislatures, Congress and the Missouri Legislature, as well as the Supreme Court of Missouri's rules of statutory

construction. I consider this a simultaneous violation of two constitutional principles, separation of powers and federalism. I further note that our brief per curiam opinion in United States v. Owen, 51 F.4th 292 (8th Cir. 2022), reviewed neither the evolution of 21 U.S.C. § 812, Sched. II (a)(4), nor the relationship between the Minnesota and federal schedules.

In two 1986 amendments, Congress substituted "cocaine, its salts, optical and geometric isomers, and salts of isomers . . ." for the listing in § 507(c) of the 1984 Act, "(including cocaine and ecgonine and their salts, isomers, derivatives, and salts of isomers and derivatives)." See Anti-Drug Abuse Act, Pub. L. 99-570, § 1867, 100 Stat. 3207 (Oct. 1986); Criminal Law and Procedure Technical Amendment Act, Pub. L. 99-646, § 84, 100 Stat. 3592 (Nov. 1986). This amendment incorporated the special definition of controlled cocaine isomers in § 802(14) into the operative provision, § 812(c), Schedule II(a)(4), leaving § 802(14) unchanged. There was no change in substance. In introducing this and other amendments in S. 1236 in 1985, Senator Thurmond described the bill as "a package of technical and minor changes to the Comprehensive Crime Control Act of 1984." 131 Cong. Rec. S00000-12 *26 (1985). The specific amendment to § 507(c) of the 1984 Act was described as "preferable since there may be isomers of hallucinogens [listed in Schedule I] and cocaine [listed in Schedule II] that are as yet unknown or undetected." Id. at *72.[14]

It is not clear why DHSS in May 1987 adopted the 1984 federal statutory listing in § 507(c), rather than the amended language now found in § 812(c), Schedule II(a)(4). Perhaps DHSS was not given notice of this later amendment, as

_____

[14]Regarding Congress's decision to include positional isomers of hallucinogens in Schedule I, but not positional isomers of cocaine in Schedule II, H.R. Rep. 1030 explained, "clandestine manufacturers have attempted to circumvent the law by manufacturing positional and geometric isomers of hallucinogens in Schedule I and optical and geometric isomers of cocaine." 4 1984 U.S.C.C.A.N. at 3445.

Mo. Rev. Stat. § 195.015.4 requires.  Perhaps this was not deemed a substantive change to the federal schedules requiring DHSS action.  Or perhaps DHSS simply overlooked a technical amendment to the federal Schedule II listing when DHSS decided that the addition of cocaine to Schedule II(a)(4) should be "similarly controlled" in Missouri.  But whatever the reason, I conclude the Supreme Court of Missouri would hold that, by adopting the earlier wording of the federal listing, to which the § 802(14) limiting definition applied, rather than the later provision that inserted the § 802(14) language in the operative federal provision, DHSS did not *add* positional cocaine isomers when it revised the substances controlled in Missouri Schedule II(a)(4) "to conform with the [newly modified] federal schedules" that excluded positional isomers.  Under the Missouri statute, when DHSS used the expedited procedure to "similarly control" cocaine in 19 C.S.R. 30-1.002(1)(B)1, the regulation would have been invalid if it added a cocaine isomer not controlled under federal law.  When "interpreting a regulation, courts should employ a construction that will avoid invalidity when possible."  See State Dep't of Lab & Indus. Rels. v. Bd. of Pub. Utils. of Springfield, 910 S.W.2d 737, 741 (Mo. App. 1995).  Thus, positional isomers of cocaine are not Schedule II controlled substances under Missouri law.

## II.

The above analysis answers the 18 U.S.C. § 924(e) sentencing enhancement issue raised in this appeal.  But there is another reason I disagree with the court's conclusion.  In United States v. Swopes, the en banc court held:

> In applying the categorical approach under the ACCA, we examine both the text of the statute and how the state courts have applied the statute. Before we conclude that a state statute sweeps more broadly than the federal definition of violent felony, there must be a "realistic probability, not a theoretical possibility," that the statute encompasses conduct that does not involve use or threatened use of violent force.

886 F.3d 668, 671 (8th Cir. 2018) (en banc) (citation omitted). Some recent decisions such as <u>Owen</u> have suggested, contrary to <u>Swopes</u>, that the realistic probability rule does not apply if a panel concludes that a state statute is "unambiguous." In my view, the proposition is obviously false. *At the very least*, evidence establishing no realistic probability that a defendant would be prosecuted and/or convicted of the allegedly overbroad offense is strong evidence that the statute does *not* unambiguously include that offense.

That is particularly true in this case. It is doubtful that positional isomers of cocaine exist outside a laboratory. It is also quite clear that no positional cocaine isomer offense has ever been prosecuted in Missouri. Indeed, the statute makes it clear that no such offense *could be prosecuted* because cocaine positional isomers have not been lawfully scheduled in accordance with § 195.015.4. What Missouri prosecutor would even attempt to bring such a charge, knowing it would be subject to a clear invalidity defense? In these circumstances, the realistic probability rule should apply and reinforce my conclusion that the Missouri statute is not overbroad. I urge the en banc court to take up this issue.

For these reasons, I would reverse the district court's decision not to sentence Anthony Myers under the Armed Career Criminal Act.

_____